UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DOUGLAS R. MCCARROLL,

                                        Plaintiff,
                                                            9:09-CV-0355
v.                                                          (NAM/TWD)

Y. MATTEAU,

                                        Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

DOUGLAS R. MCCARROLL
Plaintiff *pro se*
c/o Law Offices of Bruce Corrigan, Jr.
1853 Post Road East
Westport, Connecticut 06880

HON. RICHARD S. HARTUNIAN                       CHARLES E. ROBERTS, ESQ.
United States Attorney for the
 Northern District of New York
Counsel for Defendant
Syracuse Office
100 South Clinton Street
Syracuse, New York 13261-7198

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

This *pro se* prisoner civil rights action, commenced pursuant to *Bivens v. Six Unknown*

*Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), has been referred to me for

Report and Recommendation by the Honorable Norman A. Mordue, United States District Judge,

pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Douglas R. McCarroll alleges

that Defendant Y. Matteau, a guard at the Federal Correctional Institution in Ray Brook ("FCI

Ray Brook"), violated his constitutional rights by sexually assaulting him and harassing him and that he was motivated, in part, by Plaintiff's status as a jailhouse lawyer. Currently pending before the Court is Defendant's motion for summary judgment. (Dkt. No. 31.) For the reasons that follow, I recommend that the Court grant the motion in part and deny it in part.

## I.   FACTUAL AND PROCEDURAL SUMMARY

### A.   Defendant's Alleged Harassment of Plaintiff

The unverified complaint[1] alleges that Plaintiff was transferred to FCI Ray Brook on April 18, 2006 and assigned to the Mohawk housing unit. (Dkt. No. 1 ¶ 7.) In May 2006 Plaintiff was given a storage room in the housing unit for his legal papers and books. *Id*. ¶ 8. Beginning in June 2006 Defendant Y. Matteau began coming into the storage room while Plaintiff was there to ask him why he had so much legal work. *Id*. ¶ 9. During these encounters, Defendant "appeared agitated that the Plaintiff had a storage room for his legal work." *Id*. Defendant also made "wise cracks about the Plaintiff's *pro se* litigant status." *Id*. ¶ 10.

Defendant was assigned to Plaintiff's housing unit in April 2007. *Id*. ¶ 12. Plaintiff alleges that on April 14, 2007 he had just showered and was wearing only a bathrobe and was in his cell with his cell mate waiting for the morning count. *Id*. ¶¶ 12-15. Defendant opened the cell door and ordered Plaintiff's cell mate to step out. *Id*. ¶ 16. When Plaintiff's cell mate complied, Defendant stepped into the cell and closed the door behind him. *Id*. ¶ 17. Defendant ordered Plaintiff to turn around for a pat down. *Id*. ¶ 18. Plaintiff complied. *Id*. As Defendant

---

[1]     At his deposition, Plaintiff reiterated the allegations of his complaint, testifying under oath that "[w]hat was pleaded . . . and is filed is the same thing I'm pleading and alleging today . . . Whatever it says in this Complaint, it's the same thing today, there's nothing new." (Dkt. No. 31-3 at 18:13-17.) Page numbers in citations to the deposition refer to the numbers in the original document.

conducted the pat down, he squeezed Plaintiff's penis and said "Oh, you got shortchanged." *Id*.;

Dkt. No. 35 at 12 ¶ 4.  When Plaintiff protested, Defendant said:

> I'm not through with you yet, not by a longshot.  This is just the beginning.  You think you're so cool because you['re] the Legal Beagle here.  Well ya know what?  I own you now.  And if you tell anyone or write me up for it, nobody will believe you and you'll be put in the hole.

(Dkt. No. 1 ¶ 19; Dkt. No. 35 at 12 ¶ 5.)[2]  Defendant then exited the cell, instructed Plaintiff's

cell mate to step back inside, and locked the door.  (Dkt. No. 1 ¶ 20.)

Plaintiff was away from his cell until later that afternoon.  When he returned, he learned

that Defendant had spent "almost the entire afternoon . . . shaking down" his cell.  *Id*. ¶ 21.

Plaintiff's cell was "destroyed."  *Id*. ¶ 22.  When he asked Defendant "if this was business or

personal . . . the defendant replied 'a little business but mostly personal.'" *Id*.; Dkt. No. 35 at 12 ¶

3.

Plaintiff alleges that between April 2007 and April 2008,  Defendant engaged in a

campaign of harassing him.[3]  (Dkt. No. 1 ¶ 23.)  On one occasion, Defendant pointed his gun at

Plaintiff and smiled.  *Id*. ¶ 24.  On many occasions, Defendant used his forefinger and thumb to

make a sign as if to mean "little" when he encountered Plaintiff.  *Id*. ¶¶ 25, 29, 40, 45, 49, 53, 56,

60, 63, 65, 67, 75, 78, 86, 98, 103, 107.  On many occasions, Defendant made a kissing gesture

with his lips at Plaintiff.  *Id*. ¶¶ 26, 30, 31, 33, 36, 38, 41, 42, 47, 52, 55, 58, 61, 64, 66, 67, 69,

---

[2]        Page numbers in citations to Plaintiff's opposition refer to the page numbers assigned by the Court's electronic filing system.

[3]        In a declaration filed in opposition to the motion for summary judgment, Plaintiff declares that Defendant "verbally harassed me and threatened me approximately 198 times" between June 2006 and May 2008.  (Dkt. No. 35 at 12 ¶ 2.)

72, 74, 76, 77, 79, 81, 83, 87, 89, 93, 96, 99, 101, 102, 105, 125, 126, 127.  On many occasions, Defendant referred to Plaintiff as "my little man" and made other references to the size of Plaintiff's genitals.  *Id.* ¶¶ 28, 32, 34, 35, 37, 44, 50, 51, 62, 69, 70, 73, 84, 104, 129.  Several times, Defendant referred to Plaintiff as "sweet cheeks."  *Id*. ¶ 85, 88, 90, 91, 126.  On one occasion, Defendant said "Little man thinks he's a lawyer, does he?"  *Id.* ¶ 39.  Several times, Defendant smiled or smirked at Plaintiff.  *Id.*  43, 48, 54, 59, 68.  Several times, Defendant denied Plaintiff entry to a gate used by other inmates because "little dicks don't get a pass."  *Id.* ¶¶ 46, 57, 71.

Plaintiff alleges that he returned to his cell on December 26, 2007 to find Defendant 'shaking it down.'  (Dkt. No. 1 ¶ 80.)  Defendant told Plaintiff to come into the cell.  *Id*.  When Plaintiff did so, Defendant shut the door behind him.  *Id*.  Defendant told Plaintiff "this cell needs cleaning.  If you don't get it to the legal limit, I will.  I don't mind the legal work because you['re] a hot shot legal beagle.  But the other shit has to go . . . When I come back, it better be right."  *Id*.  Defendant instructed Plaintiff to turn around and put his arms out.  Defendant then placed both hands on Plaintiff's buttocks, squeezed them, and said "now you['re] my sweet cheeks.  Don't forget, no one will believe you if you say something and you'll go to the hole if you[] do."  *Id*.; Dkt. No. 35 at 12 ¶¶ 4-5.  Defendant left Plaintiff's cell.  (Dkt. No. 1 ¶ 80.)

Other evidence supports at least part of Plaintiff's version of this event.  Inmate Edward Ortiz declares that he saw Plaintiff going into his own cell on December 26, 2007.  (Dkt. No. 35 at 19 ¶ 2.)  He saw Defendant close the cell door after Plaintiff went in.  *Id*.  A few minutes later, Plaintiff opened his door and came out.  *Id.* ¶ 3.  Defendant came out after Plaintiff.  *Id*. ¶4.  Plaintiff asked Inmate Ortiz if he had seen anything and asked him to sign an affidavit if he had.

4

*Id*. ¶ 5.

Inmate Frank DiPetiro declares that he was sitting in the common room at lunch time on December 26, 2007 when Plaintiff came over and said that Defendant was shaking down his cell. (Dkt. No. 35 at 23 ¶ 1.)  Inmate DiPetiro observed Defendant call Plaintiff up to his cell.  *Id*. ¶ 2. He saw Plaintiff go up to cell, where Defendant closed the cell door after Plaintiff went in.  *Id*. ¶ 3.  About two minutes later, Inmate DiPetiro saw Plaintiff open his door and come out of his cell. *Id*. ¶ 4.  Defendant came out after him.  *Id*.

Plaintiff alleges that he returned to his cell on February 28, 2008 and found it locked. (Dkt. No. 1 ¶ 94.)  Defendant said he would unlock it.  *Id*.  On the way to Plaintiff's cell, Defendant stopped at a six-man cell and grabbed a mattress.  *Id*.  When they arrived at Plaintiff's cell, Defendant unlocked the cell, instructed Plaintiff to come inside, closed the door behind Plaintiff, told Plaintiff to turn around, and said "I need to squeeze those buns again little man." *Id*.  Plaintiff refused.  *Id*.  Defendant turned red in the face and said "Big mistake.  Now I'm really going to fuck with you . . . Now I'll write you a shot and this ain't over, not by a long shot."  *Id*.; Dkt. No. 35 at 12 ¶ 6.  Defendant left, carrying Plaintiff's mattress.  (Dkt. No. 1 ¶ 94.)

Again, parts of Plaintiff's version of this event are supported by other evidence.  Inmate Vincent Marino declares that he was standing in front of his cell at lunchtime on February 28, 2008 when he saw Defendant Matteau walking up the stairs carrying a mattress.  (Dkt. No. 35 at 22 ¶ 1.)  Plaintiff was walking behind him.  *Id*. ¶ 2.  Defendant unlocked Plaintiff's cell and went in.  *Id*.  Plaintiff went in after him.  *Id*.  Inmate Marino saw Defendant close the door.  *Id*. ¶ 3. About a minute later, Plaintiff exited his cell and approached Inmate Marino.  *Id*. ¶ 4.  Defendant came out of Plaintiff's cell "shortly after that carrying a mattress."  *Id*.  Plaintiff asked Inmate

Marino to look at his cell.  *Id*. ¶ 5.  Inmate Marino observed that "both mattresses were thrown about the cell and the cell was a mess."  *Id*. ¶ 6.

Later that day, Defendant issued a misbehavior report accusing Plaintiff of altering or destroying government property.  (Dkt. No. 1 ¶ 95.)  Specifically, Defendant stated that:

> I was looking for extra mattresses to give to inmates coming off the bus.  Upon entering [Plaintiff's] cell . . . I noticed that the mattress on the bed assigned to [Plaintiff] appeared thicker than normal.  Upon investigation I found that a second mattress had been opened and the filling inserted into the first mattress.  When questioned about the mattress, [Plaintiff] stated "I got the mattress brand new from counselor Ano."

(Dkt. No. 25-1 at 12.)  At the disciplinary hearing, the charge was reduced.  *Id*. at 16.  Plaintiff was found guilty of the reduced charge and sanctioned with ninety days' loss of commissary privileges.  *Id*. at 15.  A few weeks later, the charge was expunged from Plaintiff's central file.  (Dkt. No. 1 ¶ 97.)

Plaintiff alleges that he was in the law library on March 21, 2008 when another inmate told him that Defendant had been in Plaintiff's cell for most of the morning "destroying" it.  (Dkt. No. 1 ¶ 108.)  The inmate said that when he asked Defendant what he was doing, Defendant said "It's my last day in the Unit and McCarroll's due.  I'm going to fuck with him all day."  *Id*.  When Plaintiff returned to his cell that afternoon, it "looked like a cyclone hit it."  *Id.* ¶ 111.  Plaintiff found Defendant and asked him why he stole a green bell pepper from his cell.  *Id*. ¶ 116.  Defendant replied "this all could have been avoided if only you would have let me get a feel last month."  *Id*.  Later Plaintiff discovered that in addition to the pepper, Defendant had stolen a book catalog from Plaintiff's cell.  *Id*.

Plaintiff's cell mate, John Lowney, declares that Defendant left the cell in complete

6

shambles after he searched it, but that his "locker was not opened nor was anything taken from it. My plastic bin under my bed was not opened or touched." (Dkt. No. 35 at 20 ¶¶ 3-4.) Inmate Marino, who came to look at the cell, declares that "the room look[ed] like a cyclone hit it, with clothes scattered and powder in the sink and it looked like a pigsty." (Dkt. No. 35 at 22 ¶ 9.)

Defendant declares that he has "never verbally or sexually harassed [P]laintiff in any way, including calling [P]laintiff 'little dick,' 'little man,' holding my fingers up in a way to signify 'little,' making a kissing gesture, engaging in any forcible sexual touching of [P]laintiff, or any other harassment." (Dkt. No. 31-16 ¶ 3.) Based on the dates listed on his assignment sheet, he declares that he "was not present in the prison on many of the days alleged by [P]laintiff. On other days I was working in areas of the prison where I had no contact with inmates; or was working on the opposite side of the prison from [P]laintiff, and contact with him would have been highly unlikely." *Id*. ¶ 6. Specifically, Defendant declares that his assignment sheet shows that he did not have any contact with Plaintiff on three of the occasions that Plaintiff alleges that he made the "little" gesture, four of the occasions that Plaintiff alleges that he made kissing gestures, two of the occasions that Plaintiff alleges that Defendant smiled and grinned at him, two of the occasions that Plaintiff alleges that Defendant referred to him as "my little man," and one of the occasions that Plaintiff alleges that Defendant called him "sweet cheeks." *Id*. ¶¶ 9-19. However, Defendant's assignment sheet shows that he was assigned to the Mohawk housing unit on April 14, 2007, December 26, 2007, and March 21, 2008. (Dkt. No. 31-18 at 9, 11, 16.)[4]

_____

[4]	Page numbers in citations to this document refer to the page numbers assigned by the Court's electronic filing system.

**B.**      **Plaintiff's Complaints to Prison Administrators About Defendant**

Plaintiff complained in writing several times about Defendant. On January 10, 2008 he wrote to Associate Warden D.E. Porter complaining that he felt "traumatized and humiliated" when Defendant told him to clean out his cell. (Dkt. No. 31-2 at 13.) In that letter, he described his encounters with Defendant beginning in 2006. As is most relevant here, he alleged that Defendant entered his cell on April 14, 2007 after Plaintiff's morning shower, asked his cell mate to leave, and that "[s]notty words and other disdain came from Officer Matteau and after traumatizing me, he told me that he wasn't finished with me. He then step[p]ed out and my cellie step[p]ed in and the door was locked." *Id*. at 15. Plaintiff did not describe what Defendant did to "traumatize" him. Plaintiff further alleged that on December 26, 2007 Defendant came to his cell, locked the door, "and traumatized me, telling me that he doesn't mi[]nd the legal work [b]ecause he knows I do legal work or called me a legal [beagle]." *Id*. at 16. Again, Plaintiff did not describe what Defendant did to "traumatize" him. He stated that he did not "write up [Defendant] Matteau when he started with me in May or June of 2006 . . . Now he is taking the harassment further. It's time to fix the problem . . . All I am asking is to have [Defendant] Matteau stop making me his pet project to wreck." *Id*. at 17.

On March 6, 2008 Plaintiff wrote to Associate Warden Porter again. (Dkt. No. 31-2 at 12.) He complained that Defendant wrote him an incident report for having a double mattress when other inmates with double mattresses were not written up. *Id*.

On March 18, 2008 Plaintiff signed a Request for Administrative Remedy complaining of Defendant's conduct. (Dkt. No. 31-2 at 11.) Plaintiff stated that "[f]or over a year, I have been harassed, humiliated and insulted by [Defendant]'s demeaning behavior and immature

unprofessionalism.  I wrote Mr. Porter . . . I spoke with Lieutenant Niles prior to February 28, 2008, when [Defendant] wrote me a shot and said: 'I opened 4 mattresses today and you're the only one getting a shot.  Your worse than a nigger to me.' . . . Please have him stop harassing me."  *Id*.

On March 22, 2008 Plaintiff wrote again to Associate Warden Porter about Defendant. (Dkt. No. 31-2 at 31.)  He complained that the March 21 cell shakedown was retaliation for his filing of the March 18 grievance.  *Id*.

On April 7, 2008 Plaintiff filed another grievance about Defendant.[5]  (Dkt. No. 31-2 at 9.) Plaintiff requested that Defendant be "disciplined for the harassment and retaliation of only writing me a shot for a double mattress.  In addition, I would like no future retaliation from Officer Matteau . . .  I have made efforts through Mr. Porter and Lt. Niles to stop this harassment, however those efforts . . . turned out to be an object lesson in futility."  *Id*.

On May 5, 2008 a lieutenant interviewed Plaintiff regarding the March 18 grievance. (Dkt. No. 1 ¶ 130.)  Plaintiff alleges that the lieutenant told Plaintiff that every officer has an inmate that he is allowed to harass, and Defendant had chosen Plaintiff.  *Id*.  The lieutenant told Plaintiff that Defendant's conduct did not rise to the level of misconduct or harassment.  *Id*.

On May 7, 2008 Plaintiff retracted the grievance that he signed on April 7, 2008.  (Dkt. No. 31-2 at 9.)  Plaintiff asserts that he intended only to retract one grievance, not all grievances

---

[5]        The case number assigned to this grievance was 490434-F1.  (Dkt. No. 31-2 at 9.) Later, the warden referred to that case number as Plaintiff's "Request for Administrative Remedy . . . dated March 18, 2008 [and] received in this office on April 7, 2008."  *Id*. at 10.  The warden's reference appears to be incorrect because the grievance with that case number was signed on April 7 and received in the Administrative Remedy Clerk's office on April 18 and April 30.  *Id*. at 9.

involving Defendant.  (Dkt. No. 35 at 4.)  Indeed, Plaintiff's retraction states that "[a]s of this

date I have retracted *this*" grievance.  (Dkt. No. 31-2 at 9, emphasis added.)

The warden later characterized the May 5 meeting as follows:

> You . . . were informed that disciplinary action against the staff
> member must be administered by the Warden through an
> investigation involving a conduct issue.  You were told that this is not
> a staff mis-conduct issue, in that this issue is an Inmate
> Administrative Remedy to your complaint involving a staff member
> and that inmates do not impose or advise the Warden to take such
> disciplinary action on staff for their perception of staff misconduct.
> You also agreed to withdraw your complaint, signed indicating that
> the issue is resolved as well as all previous issues involving this staff
> member.

*Id.* at 10.

On May 19, 2008 Plaintiff filed another grievance regarding Defendant's confiscation of

the green pepper and catalog.  *Id.* at 26.  The warden denied the grievance because "During an

interview on May 5, 2008 . . . you agreed that all issues were considered resolved and dropped, to

include the confiscation of the alleged green pepper and the misconduct allegations.  Therefore, it

has been determined that the issue and complaint you have addressed is resolved and further

action on your part is unwarranted."  *Id.* at 27.

On May 20, 2008 Plaintiff filed another grievance regarding Defendant's March 21, 2008

shakedown of his cell.  *Id.* at 21.  The warden again denied the grievance because "During an

interview on May 5, 2008, regarding Administrative Remedy Case Number 490434-F1, you

agreed that all issues were considered resolved and dropped, to include the confiscation of the

alleged green pepper and the misconduct allegations.  Therefore, it has been determined that the

issue and complaint you have addressed is resolved and further action on your part is

unwarranted." *Id*. at 22.

Defendant declares that he was never disciplined or counseled or reprimanded in any way regarding of his conduct regarding Plaintiff or any other inmate.  (Dkt. No. 31-16  ¶ 4.)

## C.   Procedural History

Plaintiff filed his complaint in this Court on March 27, 2009.  (Dkt. No. 1.)  He alleged that Defendant conducted his campaign of harassment because "Plaintiff is a *pro se* litigant and helps other prisoners with their legal work."  *Id.* ¶ 131.  Plaintiff alleged that Defendant violated the Eighth Amendment by sexually assaulting him and retaliated against him for exercising his rights under the First and Sixth Amendments.  *Id*.  Plaintiff alleged that Defendant committed the state law torts of negligence, infliction of emotional distress, and assault and battery.  (Dkt. No. 1 ¶ 142.)  He alleged that Defendant violated his rights under the Fourth Amendment, the Due Process Clause, and the Equal Protection Clause.  *Id*.  Plaintiff requested four million dollars in compensatory damages and four million dollars in punitive damages.  *Id.* at 31.

Defendant moved to dismiss the complaint.  (Dkt. No. 13.)  Defendant argued that the complaint failed to state an Eighth Amendment claim and that verbal harassment is not actionable.  (Dkt. No. 13-2.)  Defendant did not address Plaintiff's other claims.

Magistrate Judge George H. Lowe[6] recommended that the Court deem Defendant's motion to be a partial motion to dismiss and grant it, that the Court *sua sponte* dismiss Plaintiff's substantive due process, procedural due process, Sixth Amendment, Ninth Amendment, and state sexual assault, negligence, and assault and battery claims, and that Defendant be directed to

---

[6]        Judge Lowe retired on February 9, 2012.  This case was reassigned to me on February 10, 2012.  (Dkt. No. 39.)

respond to Plaintiff's retaliation, Fourth Amendment, equal protection, and infliction of emotional distress claims.  (Dkt. No. 19.)  Judge Mordue adopted that recommendation in its entirety.  (Dkt. No. 20.)

Defendant now moves for summary judgment.  (Dkt. No. 31.)  Plaintiff has opposed the motion.  (Dkt. No. 35.)  Defendant has filed a reply.  (Dkt. No. 38.)

## II.    APPLICABLE LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material[7] fact exists, the Court must resolve

---

[7]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

### B.   Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnise Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968) (citations omitted); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").  Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial

13

experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not

shown -- that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation

omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true and construe all reasonable inferences in the

plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).

Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009). However, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct.

at 1949.

## III.   ANALYSIS

### A.      Credibility of Plaintiff's Evidence

Defendant argues that he is entitled to summary judgment because Plaintiff's allegations

are not credible. (Dkt. No. 31-1 at 3-8.)[8] Generally, of course, "[c]redibility determinations . . .

are jury functions, not those of a judge . . . . " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986). *See also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of

credibility and choices between conflicting versions of the events are matters for the jury, not for

the court on summary judgment."). There is, however, a narrow exception to the general rule

---

[8]      Page numbers in citations to Defendant's Memorandum of Law refer to the page
numbers in the original document.

that credibility determinations are not to be made on summary judgment.  *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005); *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007).

In *Jeffreys*, the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony.  *Jeffreys*, 426 F.3d at 554.  The *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony.  *Id*. at 551-52.  Defendant argues that *Jeffreys* is applicable here.

Defendant argues that Plaintiff "relies exclusively on his own testimony to support his claims."  (Dkt. No. 31-1 at 4.)  Defendant acknowledges that Plaintiff has submitted affidavits and declarations from other inmates, but argues that they "do not corroborate factual allegations material to Plaintiff's claims . . . ."  *Id*.  Rather, Defendant argues, the affidavits and declarations corroborate only that "Defendant searched Plaintiff's cell on December 26, 2007, on February 28, 2008, and on March 21, 2008."  *Id*. at 4 n.1 (citations omitted).

In support of this argument, Defendant cites *Morris v. Plummer*, No. 9:09-CV-0734 (NAM/DEP), 2011 U.S. Dist. LEXIS 31589, 2011 WL 1135936 (N.D.N.Y. Mar. 2, 2011).[9] (Dkt. No. 31-1 at 4.)  In *Morris*, an inmate claimed that correction officers used excessive force on him.  The officers moved for summary judgment.  The inmate did not oppose the motion. The only evidence before the court supporting the inmate's version of events was the inmate's complaint, a grievance that the inmate filed regarding the incident, and the inmate's deposition

---

[9]     Defendant served a copy of this unpublished decision on Plaintiff.  (Dkt. No. 31-4 at 24-36.)

testimony.  The court found that the *Jeffreys* exception applied and granted the officers' motion

for summary judgment.

Morris does not support Defendant's argument that Plaintiff here is relying "exclusively

on his own testimony to support his claims."  Plaintiff is not relying exclusively on his own

testimony.  He has provided declarations from other inmates.  Those declarations support

Plaintiff's allegations by showing that Defendant was in Plaintiff's cell alone with Plaintiff on

December 26, 2007 and February 28, 2008.  The declarations also support Plaintiff's description

of the March 21, 2008 cell search.   Plaintiff's allegations regarding these events are also

supported by Defendant's time sheets, which show that Defendant was assigned to Plaintiff's

housing unit on the days that Plaintiff alleges that Defendant touched him or attempted to touch

him and on March 21, 2008.  Thus, Plaintiff is not relying exclusively on his own testimony as

Defendant argues.

Defendant argues that Plaintiff's proffered evidence is "contradictory and incomplete."

Defendant argues that Plaintiff's claims are inconsistent with the letters and grievances he wrote

to prison officials complaining about Defendant's conduct because Plaintiff never alleged in his

grievances that Defendant sexually assaulted and harassed him.  (Dkt. No. 31-1 at 4-7.)

Defendant correctly notes that Plaintiff's grievances did not explicitly state that

Defendant sexually assaulted and harassed him.[10]  However, Plaintiff's versions of the events

---

[10]       Despite noting this fact, Defendant does not argue that the case should be
dismissed because Plaintiff failed to exhaust his administrative remedies.  It does not appear
from the record that Plaintiff exhausted his administrative remedies by appealing to the Bureau
of Prisons' General Counsel.  *Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009).  The Court
cannot *sua sponte* dismiss this action on exhaustion grounds.  Failure to exhaust is an affirmative
defense that Defendant, who is represented by counsel, must plead and prove.  *Jones v. Bock*, 549
U.S. 199 (2007).  Moreover, the record before the Court likely raises triable issues of fact that

16

underlying this action are far less contradictory than those at issue in *Jeffreys* and in the cases

cited by Defendant.   In *Jeffreys*, the plaintiff alleged in his complaint that police officers beat

him and threw him out a window.  *Jeffreys*, 426 F.3d at 551.  Before filing the complaint, he

confessed on at least three occasions that he had jumped out of the window rather than having

been thrown.  *Id.* at 552.  The plaintiff did not state that police officers threw him out of the

window until nine months after the incident.  *Id*.  The plaintiff could not identify any of the

individuals whom he alleged participated in the attack or describe their ethnicities, physical

features, facial hair, weight, or clothing on the night in question.  *Id.*

     In *Slacks v. Gray*, No. 9:07-CV-0510 (NAM/GJD), 2009 U.S. Dist. LEXIS 90178, 2009

WL 3164782 (N.D.N.Y. Sept. 29, 2009),[11] the plaintiff alleged that several officers subjected him

to excessive force.  At a disciplinary hearing conducted eleven days after the alleged incident, the

plaintiff testified that one of the four officers involved punched him twice.  *Slacks*, 2009 WL

3164782, at *14.   He did not claim that the other three officers used force on him.  *Id*.   He

admitted that he started banging his own head against the wall and on the floor.  *Id*.  In a

grievance filed fourteen days after the alleged incident, the plaintiff claimed that three of the four

officers attacked, kicked, and slapped him.  *Id*. at *15.  When he was interviewed as part of the

grievance process, the plaintiff reverted to something akin to his original story and stated that one

officer had hit him and that the other three officers were merely present.  *Id*.  By the time he filed

---

Plaintiff's failure to exhaust was justified.  *Giano v. Goord*, 380 F.3d 670, 678 (2d Cir. 2004).

     [11]     Defendant served a copy of this unpublished decision on Plaintiff with his moving
papers.  (Dkt. No. 31-4 at 37-54.)  I note that the Lexis and Westlaw versions of this case list
different decision dates.  I have used the date listed in the Westlaw citation because that was the
version that Defendant provided Plaintiff.

his federal lawsuit, the plaintiff claimed that one officer put on leather gloves and punched him twice and that two of the other officers slapped him in the head and kicked his back, buttocks, and legs after he fell to the floor.  *Id*.  Plaintiff claimed that when he told one officer that he could not get up due to a back injury, the officer told him he did not have a back injury and kicked him again.  *Id*.  The officer then dragged the plaintiff across the floor, slamming him against the wall and then yanked up the plaintiff underpants so hard that it bruised his tail bone.  *Id.*  At his deposition, the plaintiff testified that the first officer kicked him more than five times.  *Id*.  He testified that the defendants kicked him for two or three minutes.  *Id*.  He did not mention the bruised tail bone.  *Id*.  The medical evidence showed that the plaintiff's only injury was a scraped elbow.  *Id*. at *16.  In opposition to the defendants' motion for summary judgment, the plaintiff "strenuously denie[d]" that he banged his own head against the wall and the floor, a fact that he had admitted at his disciplinary hearing.  *Id*. at *14.   Finding that the plaintiff's many versions of the events were "simply at odds with each other and at odds with the medical evidence," the court applied *Jeffrey*, discredited the plaintiff's version of events, and granted summary judgment for the defendants.  *Id*. at *17.

The plaintiff in *Morris*, like the plaintiff in *Slacks*, claimed that several officers subjected him to excessive force.  In a grievance filed the day after the incident, the plaintiff alleged that two officers pinned down the upper half of his body and beat him while a third officer beat his right foot nonstop.  *Morris*, 2011 WL 1135936, at *10.  He did not claim that he had been beaten with a baton.  *Id*.  He alleged in his complaint that he was "repeatedly beaten" while handcuffed, that one officer struck him multiple times with a baton, and that two other officers punched, slapped, and kicked him in the stomach, ribs, and back.  *Id*.  The plaintiff's deposition testimony

18

established that the cell where the incident occurred was too small for an officer "to have wielded

a baton . . . without fear of injuring one of the other two officers . . . ." *Id*.  The plaintiff also

testified that the officers grabbed him by the neck and tried to choke him, a claim that appeared

neither in his grievance nor in his complaint. *Id*.  At his deposition, the plaintiff testified that he

"did not see but assumed that a corrections officer was using a baton to beat his foot," that the

officer hit his foot approximately ten times, and that he saw the officer with the baton in his hand

before he holstered it. *Id*. at 11.  The court concluded that the plaintiff's evidence was

contradictory and incomplete because the "record is devoid of any evidence . . . that would

support the conclusory allegation in [the] complaint that during the course of the relatively brief

incident [the plaintiff] was beaten with a baton, and kicked, slapped, and punched by the

defendant corrections officers." *Id*. at 13.

      Here, Plaintiff's grievances do not contradict the allegations of the complaint.  It is true

that Plaintiff did not state in his grievances that Defendant sexually assaulted and harassed him.

However, the grievances do state that Defendant "traumatized" Plaintiff when they were alone in

Plaintiff's cell on April 14, 2007 and December 26, 2007. (Dkt. No. 31-2 at 15-16.)  Plaintiff

declares in opposition to the motion for summary judgment that Defendant "threatened me with

going to the hole if I told anyone of the intentional sexual assaults."  (Dkt. No. 35 at 12 ¶ 5.)  A

reasonable juror could conclude that Plaintiff's used the euphemistic word "traumatize" because

he did not want to reveal the sexual nature of the incident.  A reasonable juror could also

conclude that Plaintiff did not allege that he had been sexually touched because he was not, in

fact, sexually touched.  It is this very type of credibility determination that should be left to a jury

except in the very rare instance where the plaintiff relies almost exclusively on his own testimony

and that testimony is actually contradictory.  Here, Plaintiff's testimony is not contradictory.

Defendant also argues that Plaintiff's complaint in this action is inconsistent with the grievances he filed because Plaintiff retracted the grievances.  (Dkt. No. 31-1 at 5; Dkt. No. 38 at 1-3.)  Defendant argues that *Jeffreys* should apply because Plaintiff "offers no reason why the court should conduct a trial regarding claims of harassment which he thought deserved to be retracted and abandoned at the administrative level."  (Dkt. No. 38 at 3.)  As discussed above, Plaintiff asserts that he intended to withdraw only one of his grievances, not all of them.  (Dkt. No. 35 at 4.)  The language Plaintiff used in his retraction ("[a]s of this date I have retracted this [grievance]" supports that assertion.  (Dkt. No. 31-2 at 9.)  Plaintiff did not state that he considered his issues with Defendant "resolved": it was the warden, not Plaintiff, who characterized the retraction in that manner.  *Id.* at 10.  Plaintiff could have retracted the grievance for any number of reasons.  The mere fact that he did so does not compel this Court to apply the "narrow exception" of *Jeffreys*.

Finally, Defendant argues that the Court should find as a matter of law that Plaintiff's evidence is not credible because "Defendant has adduced documentary evidence establishing that, on twelve of the dates on which Plaintiff alleges a harassment incident, Defendant was either assigned to another part of the prison compound, assigned to a part of the facility that has no access to the inmate population, or was absent from the facility entirely."  (Dkt. No. 31-1 at 7.)  As noted above, and as noted by Plaintiff in opposition to the motion for summary judgment (Dkt. No. 35 at 5), that list of twelve dates does not include the dates on which Plaintiff claims that Defendant committed the most egregious acts against him.  In addition, it is notable that Defendant's declaration in support of the motion for summary judgment does not include his

20

version of what occurred in Plaintiff's cell on April 14, 2007, December 26, 2007, and February 28, 2008.  He simply makes the blanket statement that "I have never verbally or sexually harassed plaintiff in any way, including calling plaintiff 'little dick,' 'little man,' holding up my fingers in a way to signify 'little,' making a kissing gesture, engaging in any forcible sexual touching of plaintiff, or any other harassment."  (Dkt. No. 31-16 ¶ 3.)  That lack of specificity distinguishes this case from *Jeffrey, Morris*, and *Slacks*.  In those cases, the defendant correction officers provided affidavits with detailed descriptions of their versions of the incidents.  Here, a reasonable juror could conclude that Plaintiff's misstatements about the twelve dates indicates that he is lying about the more major incidents.  However, a reasonable juror could also conclude that the misstatements are immaterial.  A reasonable juror could conclude that Plaintiff's version of events is more credible than Defendant's because it includes more detail.  A reasonable juror could also conclude that Defendant's non-specific denial of any wrongdoing is credible. Therefore, I decline to apply the *Jeffreys* exception to decide credibility issues in favor of Defendant.

### B.    Retaliation

Plaintiff alleges that Defendant retaliated against him in four ways.  First, he alleges that Defendant sexually touched him because "Plaintiff is a *pro se* litigant and helps other prisoners with their legal work."  (Dkt. No. 1 ¶ 131.)  Second, he alleges that Defendant searched his cell on March 21, 2008, because Plaintiff spurned his advances on February 28, 2008, and filed a grievance against him on March 18, 2008.  *Id*. ¶¶ 106, 108, 116.  Third, he alleges that Defendant issued a misbehavior report against him on February 28, 2008, because he spurned his advances earlier that day.  *Id*. ¶ 94.  Fourth, he alleges that Defendant made a series of sexually harassing

21

comments and gestures in retaliation for his status as a *pro se* litigant.  *Id*. ¶¶ 23-26, 29-79, 81,

83-91, 93, 96, 98-99, 101-105, 107, 125-127, 129.

  To prevail on a retaliation claim, a plaintiff must prove by the preponderance of the

evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendant took "adverse

action" against the plaintiff–namely, action that would deter a similarly situated individual of

ordinary firmness from exercising his or her constitutional rights[12]; and (3) there was a causal

connection between the protected speech and the adverse action--in other words, that the

protected conduct was a "substantial or motivating factor" in the defendant's decision to take

action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274,

287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

  Defendant moves for summary judgment of Plaintiff's retaliation claims.  (Dkt. No. 31-1

at 13-21.)

  1. <u>Sexual Touching</u>

   a. *Protected Conduct*

  Plaintiff alleges that he was engaged in protected conduct before Defendant sexually

touched him.  Specifically, he alleges that he "is a *pro se* litigant and helps other prisoners with

their legal work."  (Dkt. No. 1 ¶ 131.)  At his deposition, Plaintiff testified that he first

represented himself in a legal matter in about 1979.  (Dkt. No. 31-3 at 30:25-31:24.)  He began

helping other inmates with their legal work in June 1995 and continued doing so even after he

was released from prison.  *Id*. at 31:25-32:6.  A search of PACER indicates that Plaintiff filed ten

---

  [12] Defendant argues that Plaintiff's retaliation claim should be dismissed because the
evidence shows that Plaintiff was not *subjectively* deterred.  (Dkt. No. 31-1 at 14-15.)  The
Second Circuit, however, applies an objective standard, as Defendant recognizes.  *Id*. at 14.

*pro se* petitions or complaints[13] on his own behalf before June 2006, when he alleges that

Defendant began commenting on his legal activities.[14]  Plaintiff filed another complaint before

the first alleged touching incident occurred on April 14, 2007.  *McCarroll v. United States*, No.

4:2007-CV-40086 (D. Mass.) (filed Mar. 29, 2007).  Plaintiff filed two more *pro se* complaints

before the second alleged touching incident occurred on December 26, 2007.  *McCarroll v.*

*United States*, No. 3:2007-CV-00959 (D. Conn.) (filed June 20, 2007); *McCarroll v. Levin*, No.

1:2007-CV-0391 (D.R.I.) (filed Oct. 18, 2007).  "Prisoners . . . have a constitutional right of

access to the courts . . . for the redress of grievances."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d

Cir. 1995).  Therefore, I find that Plaintiff was engaged in protected conduct.

      b.    *Adverse Action*

      Defendant argues that the alleged sexual touching does not constitute adverse action

because "ample case law from this circuit establishes that such contact is *de minimis* and does not

state a constitutional violation."  (Dkt. No. 31-1 at 16, citing *Boddie v. Schneider*, 105 F.3d 857,

861 (2d Cir. 1997).)  It is true that the type of sexual touching that Plaintiff alleges does not state

---

      [13]    Defendant does not argue that the "three strikes" provision of 28 U.S.C. § 1915(g) bars Plaintiff from proceeding *in forma pauperis*, and I have not determined whether or not Plaintiff's litigation history reveals the existence of three strikes that predated the filing of this action.

      [14]    *McCarroll v. Connecticut*, No. 3:2005-CV-01298 (D. Conn.) (filed Aug. 16, 2005); *McCarroll v. United States*, No. 3:2000-CV-00198 (D. Conn.) (filed Jan. 27, 2000); *McCarroll v. Connley*, No. 3:1994-CV-02024 (D. Conn.) (filed Nov. 29, 1994); *McCarroll v. Nardozzi*, No. 3:1996-CV-00124 (D. Conn.) (filed Jan. 22, 1996); *McCarroll v. Beardsley*, No. 3:1996-CV-00150 (D. Conn.) (filed Jan. 30, 1996); *McCarroll v. Voket*, No. 3:1996-CV-01022 (D. Conn.) (filed May 23, 1996); *McCarroll v. Moynahan*, No. 3:1998-CV-01562 (D. Conn.) (filed Aug. 5, 1998); *McCarroll v. Winterhalder*, No. 3:1999-CV-02298 (D. Conn.) (filed Nov. 30, 1999); *McCarroll v. Egan*, No. 1:1996-CV-00315 (D.R.I.) (filed May 30, 1996); *McCarroll v. Winn*, No. 4:06-CV-40076 (D. Mass.) (filed Apr. 25, 2006).

an independent Eighth Amendment claim.  It is for that very reason that this Court dismissed Plaintiff's Eighth Amendment claims without leave to amend.  (Dkt. No. 19 at 7-10; Dkt. No. 20 at 2.)  However, conduct does not need to rise to the level of an independent constitutional violation to be "adverse action" for the purposes of a retaliation claim.  For example, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."  *Boddie*, 105 F.3d at 862 (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)).  But the filing of a false misbehavior report *can* constitute adverse action for the purposes of a retaliation claim.  *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).

As stated above, the correct standard for determining whether a defendant took "adverse action" is to examine whether the action would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.  A reasonable juror could conclude that two incidents of sexual touching accompanied by specific references to Plaintiff's legal work would deter a similarly situated person of ordinary firmness from engaging in future legal work.  Therefore, I conclude that there is a triable issue of fact that Defendant's alleged sexual touching constituted "adverse action."

      c.    *Causal Connection*

Defendant argues that Plaintiff cannot establish a causal connection between any protected conduct and the alleged adverse action.  (Dkt. No. 31-1 at 19-21.)  Although this is a very close case, I find that Plaintiff has raised a triable issue of fact.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions.  *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

1995)).  The relevant factors include the temporal proximity between the protected activity and the alleged retaliatory act and statements by the defendant concerning his or her motivation.[15]  *Id.* (citing *Colon*, 58 F.3d at 872-73).  "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action."  *Id.*

Defendant argues that Plaintiff cannot establish temporal proximity because the "complaint does not describe even a single episode of protected conduct on Plaintiff's part . . . or articulate[ ] the connection between any such episode and retaliatory conduct by Defendant."  (Dkt. No. 31-1 at 19-20.)  Defendant is correct that Plaintiff has not alleged any specific protected conduct that preceded the incidents of sexual touching.  The evidence shows that Plaintiff engaged in protected conduct after the sexual touching incidents by filing grievances and writing letters to prison officials about Defendant.  (Dkt. No. 31-2 at 9, 11-17, 21, 26, 31-33.) However, other than alleging that he was a jailhouse lawyer who had a storage room to store his legal papers and books (Dkt. No. 1 ¶ 8), Plaintiff has not produced any evidence that he was engaged in any particular protected conduct before the incidents on April 14 and December 26, 2007.  As discussed above in Section III(B)(1)(a), a search of PACER shows that Plaintiff filed a number of lawsuits before Defendant allegedly sexually touched him.  However, Plaintiff has never in the course of this litigation referred specifically to any of those actions.

Plaintiff's vagueness about his protected conduct makes this case analogous to *Garcia v. Watts*, No. 08 Civ. 7778, 2009 U.S. Dist. LEXIS 84697, at *41-42 n.12, 2009 WL 2777085, at

---

[15]       Two factors discussed in *Baskerville* and *Colon* are not relevant to Plaintiff's claim regarding sexual touching because they apply specifically to retaliation claims regarding false misbehavior reports.

*12 n.12 (S.D.N.Y. Sept. 1, 2009)[16], cited by Defendant.[17]   There, the court stated that the

plaintiff had "not presented circumstantial evidence of improper motive because he d[id] not

identify which grievance forms the basis of his retaliation claim and, thus, it is impossible to

evaluate the temporal proximity between the protected activity and the alleged retaliatory act."   If

the Court relied solely on the evidence produced by Plaintiff, a finding of no temporal proximity

would be warranted for the reasons articulated in *Garcia*.   However, as discussed above, public

records show precisely when Plaintiff filed *pro se* complaints and petitions.

Plaintiff filed a federal lawsuit on March 29, 2007 - less than three weeks before the first

alleged touching incident.  *McCarroll v. United States*, No. 4:2007-CV-40086 (D. Mass.).   He

filed another federal lawsuit six months before the second alleged touching incident, and yet

another two months before the second incident.  *McCarroll v. United States*, No. 3:2007-CV-

00959 (D. Conn.) (filed June 20, 2007); *McCarroll v. Levin*, No. 1:2007-CV-0391 (D.R.I.) (filed

Oct. 18, 2007).   "A plaintiff can establish a causal connection that suggests retaliation by

showing that protected activity was close in time to the adverse action."  *Espinal v. Goord*, 558

F.3d 119, 129 (2d Cir. 2009).   No bright line test has been drawn "to define the outer limits

beyond which a temporal relationship is too attenuated to establish a causal relationship between

the exercise of a federal constitutional right and an allegedly retaliatory action."  *Id.* (quoting

*Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001)).   The Second

Circuit has held that the passage of "only six months" is sufficient to support an inference of a

---

[16]     The Lexis and Westlaw versions of this case list different decision dates.  I have used the date listed in the Westlaw citation.

[17]     Defendant served a copy of this unpublished decision on Plaintiff with his moving papers.  (Dkt. No. 31-9 at 1-23.)

causal connection.  *Id*.  (citing *Gorman-Bakos*, 252 F.3d at 555 (suggesting the lapse of five

months between protected activity and retaliation may show a causal connection)).  Therefore,

there is a triable issue of fact regarding temporal proximity.

Regarding statements about motivation, Plaintiff alleges that Defendant commented on

his legal work during both alleged incidents of sexual touching.  Specifically, he alleges that

Defendant referred to him as a "legal beagle" during both incidents.  (Dkt. No. 1 ¶¶ 19, 80.)

Defendant does not deny making those statements.  (Dkt. No. 31-16.)  Thus, Plaintiff has raised a

triable issue of fact regarding the causal connection between the protected conduct and the

alleged adverse action.  Therefore, I recommend that the Court deny Defendant's motion for

summary judgment dismissing this claim.

2.    Cell Search

Plaintiff alleges that Defendant "destroyed" Plaintiff's cell three days after Plaintiff filed

a grievance, stating that he did it to "fuck with" Plaintiff and that "this all could have been

avoided if only you would have let me get a feel last month."  (Dkt. No. 1 ¶ 108, 116.)  Plaintiff

has provided evidence from other inmates that Defendant did not touch Plaintiff's cell mate's

belongings but left Plaintiff's belongings in shambles.  (Dkt. No. 35 at 20, 22.)  Defendant's

affidavit supporting the motion for summary judgment does not discuss the event in any detail.

(Dkt. No. 31-16.)  Defendant does not, for instance, provide a legitimate penological reason for

the March 21, 2008 search or deny Plaintiff's allegations about his motivations and statements.

Rather, Defendant simply declares that "I searched plaintiff's cell several times while he was an

inmate.  I routinely found items that were contraband and prohibited by the prison rules . . .

Plaintiff became very angry when I enforced the prison rules against him."  *Id*. ¶ 5.

Defendant argues that Plaintiff's allegation regarding the March 21, 2008 cell search is insufficient to support a finding of adverse action.  (Dkt. No. 31-1 at 17.)  If I were deciding this case in a vacuum, I could well conclude that the cell search constituted adverse action.  However, other district courts in the Second Circuit have found that, at minimum, correction officers are "entitled to qualified immunity on a claim of . . . retaliation relating to cell searches, since it is not well-settled that cell searches can be the subject of a . . . retaliation . . . claim." *Jones v. Harris*, 665 F. Supp. 2d 384, 398 (S.D.N.Y. 2009).  Other courts have gone further, holding outright that "retaliatory searches are not actionable under § 1983."[18] *Lebron v. Selsky*, No. 9:05-CV-0172 (GTS/DRH), 2010 U.S. Dist. LEXIS 32004, at *17-18, 2010 WL 1235593, at *5 (N.D.N.Y. Mar. 31, 2010) (collecting cases).[19]  Therefore, I recommend that the Court dismiss Plaintiff's retaliation claim regarding the March 21, 2008 cell search.

     3.    <u>Misbehavior Report</u>

     a.    *Protected Conduct/Adverse Action/Causal Connection*

Plaintiff alleges that Defendant issued a misbehavior report against him on February 28, 2008 because he spurned his advances earlier that day.  (Dkt. No. 1 ¶¶ 94-95.)  This is sufficient to raise a triable issue regarding protected conduct, an adverse action, and a causal connection. *See Snyder v. McGinnis*, No. 03-CV-0902E, 2004 U .S. Dist. LEXIS 17976, at *8, 2004 WL 1949472, at *3 (W.D.N.Y. Sept. 2, 2004) (finding allegation that correctional officer filed false

---

[18]    *Bivens* cases generally apply the same standard as actions brought by state prisoners under 42 U.S.C. § 1983.  *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995).

[19]    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

misbehavior report to cover up his use of excessive force sufficient to state a retaliation claim).[20]

        b.     *Defense*

Even where an inmate plaintiff meets his burden of showing that a defendant took adverse action against him in retaliation for protected conduct, a defendant is entitled to summary judgment if he or she can demonstrate that he or she would have taken the same action against the plaintiff absent any retaliatory motivation.  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002).  Courts employ a "'presumption that a prison official's acts to maintain order are done for a proper purpose.' "  *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting *Rivera v. Senkowski*, 62 F.3d 80, 86 (2d Cir. 1995)).  Thus, "'[t]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage.' "  *Id*. (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994)).  "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."  *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999) (per curiam).  Often defendants accused of filing false misbehavior reports meet their burden by showing that "there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report."  *Gayle*, 313 F.3d at 682 (punctuation and citation omitted).

---

[20]      The Lexis and Westlaw versions of this case list different decision dates.  I have used the date from the Westlaw decision.  The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Defendant argues that the retaliation claim based on the misbehavior report should be dismissed because he "had non-retaliatory reasons to issue the report." (Dkt. No. 31-1 at 17.) Although this is a close case, I find that Defendant has not demonstrated that (a) the challenged action *clearly* would have been taken on a valid basis alone; or (b) that there is no dispute that the plaintiff committed the *most serious*, if not all, of the prohibited conduct charged in the misbehavior report.

The facts here are similar to those in *Davis v. Rhoomes*, No. 07 Civ. 6592, 2010 U.S. Dist. LEXIS 103579, 2010 WL 3825728 (S.D.N.Y. Sept. 30, 2010).[21]  There, the plaintiff alleged that a prison officer issued a misbehavior report in retaliation for plaintiff's grievances against the officer. *Davis*, 2010 WL 3825728, at *1.  The misbehavior report charged the plaintiff with three offenses. *Id*. at *3.  After a disciplinary hearing, the plaintiff was found guilty of two of the charges but acquitted of one charge. *Id*.  After the plaintiff filed a federal lawsuit alleging retaliation, the officer moved for summary judgment. *Id*. at *1.  The magistrate judge recommended denying the motion. *Id*.  The officer objected to the recommendation, arguing that she had "set forth evidence tending to show that she had a legitimate basis for filing the misbehavior report." *Id*. at *6.  The district court judge adopted the recommendation over the officer's objections. *Id*. at *7.  The court stated that although the officer "adduced substantial evidence that her description of the events leading up to the misbehavior report was accurate, and therefore that it was the plaintiff's misconduct that caused the filing of the misbehavior report and not his filing of a grievance against" the officer, she was not entitled to summary judgment.

---

[21]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

*Id*.  This was because the plaintiff had "adduced evidence to support his contention that a prima facie case of retaliation existed," including evidence of the close temporal proximity of the grievance and the misbehavior report and the hearing officer's determination that one of the charges in the misbehavior report was unfounded.  *Id*.  The court stated that while "the plaintiff's evidence of a causal relationship between the protected activity and the adverse action is not overwhelming, it is nonetheless sufficient to survive a motion for summary judgment."  *Id*. Moreover, the court stated that:

> the defendants have not carried their burden of showing that the same adverse action would have been taken even absent a retaliatory animus.  In support of this contention, they point to [the hearing officer]'s finding that the plaintiff was guilty on the two charges in [the officer]'s report.  In order for the defendants to carry their burden, however, it is not enough that they allege that the allegedly retaliatory actions *could* have been taken absent a retaliatory animus - i.e. that there was a possible legitimate basis for the challenged actions.  Rather, the defendants must establish that the actions *would* have been taken, even absent impermissible motives.  The fact that two charges were affirmed at the misbehavior hearing does not, standing alone, entitle the defendants to summary judgment.

*Id*. (emphasis in original).

Here, the misbehavior report that Defendant issued charged Plaintiff with altering government property.  (Dkt. No. 25-1 at 12.)  Defendant argues that "Plaintiff conceded at his disciplinary hearing, and does not now dispute, that he was in unauthorized possession of a second mattress."  (Dkt. No. 31-1 at 18 n.13.)  Plaintiff did admit at his disciplinary hearing that he possessed the unauthorized mattress.  (Dkt. No. 25-1 at 15.)  That fact, however, is immaterial.  The most serious charge in the misbehavior report - indeed, the only charge - was that Plaintiff destroyed, altered, or damaged government property.  *Id*.  Plaintiff did not admit to

31

committing that violation, and in fact was not found guilty of that charge.  *Id*. at 15-16.  Rather, the charge was reduced to a "code 305" for "possession of anything not authorized."  *Id*. at 16. Plaintiff asserts that even this reduced charge was expunged from his record a few weeks later. (Dkt. No. 35 at 12 ¶ 6.)  The declaration that Defendant filed in support of the motion for summary judgment does not even mention the February 28, 2008 misbehavior report.  (Dkt. No. 31-16.)  Thus, the Court does not have any information about Defendant's reasons for charging Plaintiff with the more serious infraction rather than the lesser infraction.

Plaintiff declares that when he spurned Defendant's advances, Defendant threatened to issue a misbehavior report against him.  (Dkt. No. 35 at 12 ¶ 6.)  Plaintiff alleges that Defendant brought a new mattress to Plaintiff's cell that day and took Plaintiff's mattress with him when he left Plaintiff's cell.  (Dkt. No. 1 ¶ 94.)  Inmate Marino declares that he observed Defendant entering and exiting Plaintiff's cell carrying a mattress.  (Dkt. No. 35 at 22 ¶¶ 1, 4.)  Defendant does not deny these allegations.  (Dkt. No. 31-16.)  Based on this evidence, a reasonable juror could conclude that Defendant himself placed the altered mattress in Plaintiff's cell and then issued a misbehavior report charging Plaintiff with altering it.  Thus, there is a triable issue of fact that Defendant would not have issued the misbehavior report absent a retaliatory motive. Therefore, I recommend that the Court deny Defendant's motion for summary judgment of this claim.

### 4.    Comments

Defendant argues that the various comments that Plaintiff alleges that Defendant made do not, as a matter of law, constitute "adverse action."  (Dkt. No. 31-1 at 16-17.)  Defendant is correct that verbal threats are not generally considered adverse action:

Under some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered. *See, e.g., Hepworth v. Suffolk County*, No. 2:02-cv-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment" rights). Thus, vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim. *See, e.g., Bartley v. Collins*, No. 95 Civ. 10616, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (stating that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing *Dawes*, 239 F.3d at 493, for the proposition that "[n]ot every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment")*; Alicea v. Howell*, 387 F. Supp.2d 227, 237 (W.D.N.Y. 2005) (defendant's "alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] d[id] not give rise to a First Amendment retaliation claim"); *Cruz v. Hillman*, No. 01 Civ. 4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that defendant made statement which "expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' " was insufficient to state retaliation claim).

*Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) (allegation that correctional officer "chastised" prisoner and said that he was "getting tired of" prisoner filing grievances insufficient to state a retaliation claim). The "fact that a threat was never carried out, while necessarily dispositive, is a factor weighing against a finding of adverse action." *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005).

Here, although Defendant's alleged comments and gestures are potentially relevant to Plaintiff's surviving retaliation claims, they are not actionable in and of themselves. Therefore, I recommend that the Court dismiss any retaliation claims based solely on Defendant's alleged

comments and gestures.

### C.     Fourth Amendment

The complaint alleges that Defendant violated Plaintiff's Fourth Amendment rights by subjecting him to an unreasonable search and seizure.  (Dkt. No. 1 ¶¶ 142-43.) Read broadly, Plaintiff's complaint alleges that Defendant violated his Fourth Amendment rights in two ways. First, he complains of cell searches that Defendant conducted.  Second, the allegations about sexual touching can be broadly construed as Fourth Amendment claims.  Defendant moves for summary judgment of these claims.  (Dkt. No. 31-1 at 8-11.)

#### 1.     Cell Searches

Defendant argues that prisoners cannot assert Fourth Amendment claims regarding cell searches, even where the search is retaliatory or arbitrary.  (Dkt. No. 31-1 at 10-11.)  Defendant is correct.  *DeMaio v. Mann*, 877 F. Supp. 89, 95 (N.D.N.Y. 1995) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights.").  Therefore, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim regarding the cell searches that Defendant conducted.

#### 2.     Touching Incidents

Defendant argues that Plaintiff's Fourth Amendment claim regarding the sexual touching incidents should be dismissed because "Plaintiff has offered no support beyond his bare allegations . . . that Defendant acted not in furtherance of legitimate penological objectives, but for the improper purposes alleged."  (Dkt. No. 31-1 at 10.)

The Fourth Amendment prohibits "unreasonable" searches.  In the prison context, "a search unsupported by probable cause may be reasonable when special needs, beyond the normal

34

need for law enforcement, make the warrant and probable-cause requirement impracticable." *Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002); *Roe v. Marcotte*, 193 F.3d 72, 78 (2d Cir. 1999). Searches of prisoners are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *See Frazier v. Ward*, 528 F. Supp. 80, 81 (N.D.N.Y. 1981). However:

> a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g.,Iqbal v. Hasty*, 490 F.3d 143, 172 (2d Cir. 2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino* [*v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992)](strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y.2006).

*Miller v. Bailey,* No. 05-CV-5493, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008).[22]

Here, Defendant argues that the sexual touching incidents were related to a legitimate penological goal because "[p]at searches like those described by Plaintiff are conducted on a 'routine or random basis' to search for prohibited contraband." (Dkt. No. 31-1 at 10.) Pursuant to BOP Program Statement 5521.05(6)(a), "[s]taff may conduct a pat search of an inmate on a routine or random basis to control contraband." A pat search is "[a]n inspection of an inmate, using the hands, that does not require the inmate to remove clothing. The inspection includes a search of the inmate's clothing and personal effects." *Id*.

---

[22]   No Lexis citation is available. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

35

The general policy cited by Defendant does not establish that the searches at issue in this case were related to a legitimate penological goal. The declaration filed by Defendant in support of the motion for summary judgment does not describe the alleged April 14 and December 26, 2007 incidents. (Dkt. No. 31-16.) Defendant provides no reason at all for conducting the searches. Although Defendant makes the blanket statement that he "routinely found items that were contraband and prohibited by the prison rules" in Plaintiff's cell, he does not declare that such items were discovered on Plaintiff's person. *Id*. ¶ 5. This lack of detail is insufficient to meet Defendant's burden on summary judgment of establishing that he is entitled to judgment as a matter of law.

The case on which Defendant relies, *Eng v. Therrien*, No. 9:04-CV-1146, 2007 U.S. Dist. LEXIS 99246, 2008 WL 141794 (N.D.N.Y. Jan. 11, 2008) is distinguishable.[23] There, the plaintiff did not claim that officers violated his Fourth Amendment rights by conducting a pat search. He acknowledged that "it was perfectly permissible for correctional officers, while conducting the authorized pat frisk[ ], to touch his groin area and buttocks through clothing." *Eng*, 2008 WL 141794, at *8 (punctuation omitted). Rather, he alleged that the defendants violated his Fourth Amendment rights when they touched his penis, testicles, and rectal cavity. *Id*. at *6. Here, Plaintiff does not object merely to the way that Defendant touched him during an authorized search: he asserts that there was no legitimate penological reason for Defendant to touch him at all. (Dkt. No. 35 at 5-6.)

_____

[23]     Defendant served a copy of this unpublished decision on Plaintiff. (Dkt. No. 31-5 at 15-32.) The Lexis and Westlaw versions of this case list different decision dates. I have used the date listed in the Westlaw citation because that was the version that Defendant provided to Plaintiff.

Defendant has not established as a matter of law that the searches of Plaintiff were reasonably related to a legitimate penological goal and conducted in a reasonable manner. Therefore, I recommend that the Court deny Defendant's motion for summary judgment of Plaintiff's Fourth Amendment claims regarding the April 17 and December 26, 2007 incidents.

> **D.      Equal Protection**

Plaintiff alleges that Defendant violated his right to equal protection.  (Dkt. No. 1 ¶ 142.) Defendant moves for summary judgment of this claim.  (Dkt. No. 31-1 at 11-13.)  Defendant argues that he is entitled to judgment because Plaintiff has failed to identify a comparator with whom he is similarly situated.  *Id*. at 11.  Defendant is correct.

In order to state an equal protection claim under a "class of one" theory, a plaintiff must allege (1) that he was intentionally treated differently from other similarly situated individuals; and (2) that the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus.  *Assoko v. City of New York*, 539 F. Supp. 2d 728, 734-35 (S.D.N.Y. 2008).  The standard for proving a "class of one" case becomes much more stringent after a case proceeds beyond the pleading stage.  After the pleading stage, a plaintiff must show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [that] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake."  *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).  There must be an "extremely high" level of similarity between the plaintiff and the persons with whom he compares himself. *Neilson*, 409 F.3d at 104.

Furthermore, class of one plaintiffs are required to prove "intentional disparate treatment, that is, [they must] demonstrate the decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 143 (2d Cir. 2010) (quoting *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001) (internal quotes omitted).

Here, Plaintiff has not identified any comparator or shown an "extremely high" level of similarity between himself and any other inmate. Therefore, I recommend that the Court grant Defendant's motion for summary judgment of this claim.

### E.    State Law Claims for Infliction of Emotional Distress

Plaintiff alleges that Defendant committed the New York state tort of "the intentional and/or negligent infliction of emotional distress and great emotional distress." (Dkt. No. 1 ¶ 142.) Defendant moves for summary judgment of both Plaintiff's claim for intentional infliction of emotional distress and his claim for negligent infliction of emotional distress. (Dkt. No. 31-1 at 21-25.) I will address the claims separately.

#### 1.    Intentional Infliction of Emotional Distress

Defendant argues that Plaintiff's intentional infliction of emotional distress claim is barred by the applicable statute of limitations. (Dkt. No. 21-1 at 22-25.) Defendant is correct.

The statute of limitations for intentional infliction of emotional distress is one year. N.Y C.P.L.R. § 215(3) (McKinney 2003). Plaintiff's complaint states that it was "submitted" on March 25, 2009. (Dkt. No. 1 at 32, 34.) The vast majority of the conduct about which Plaintiff complains occurred outside the statute of limitations.

The continuing violation doctrine does not save Plaintiff's intentional infliction of

38

emotional distress claim for two reasons. First, "New York courts have been reluctant to apply a continuing wrong theory . . . in intentional infliction of emotional distress claims." *Moultrie v. VIP Health Care Servs.*, No. 08-CV-0457, 2009 U.S. Dist. LEXIS 22413, at *19, 2009 WL 750219, at *7 (E.D.N.Y. Mar. 19, 2009) (quoting *Mariani v. Consol. Edison Co.*, 982 F. Supp. 267, 273-74 (S.D.N.Y. 1997).[24] Second, even where the doctrine applies, "the plaintiff must allege acts within the statute of limitations sufficient to make out a claim . . . independent of those acts that are part of the offending course of conduct that occurred outside the statute of limitations." *Id.* (punctuation omitted). Plaintiff has not met that burden here.

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of [ ] extreme and outrageous conduct . . . . " *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). The only allegations in the complaint about Defendant's conduct that occurred within the statute of limitations are that: (1) Defendant made the "kissing gesture" at Plaintiff on March 31, 2008, and April 13, 2008; (2) Defendant made the "kissing gesture" and called Plaintiff "sweet cheeks" on April 12, 2008; (3) on April 14, 2008, Defendant "threw the Plaintiff's chair [out] of the tier"; and (4) Defendant called Plaintiff "little man" on April 26, 2008. (Dkt. No. 1 ¶¶ 125-129.) None of these alleged incidents constitutes the type of "extreme and outrageous" conduct required for an intentional infliction of emotional distress claim. Although potentially annoying and disrespectful, these alleged actions were not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto*, 164 F.3d at 827

---

[24]     Defendant served a copy of this unpublished decision on Plaintiff. (Dkt. No. 31-13 at 17-23.)

(quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993)).  Therefore, I recommend

that the Court dismiss Plaintiff's claim for intentional infliction of emotional distress.

     2.    <u>Negligent Infliction of Emotional Distress</u>

     Defendant argues that he is entitled to summary judgment of Plaintiff's negligent

infliction of emotional distress claim.  (Dkt. No. 31-1 at 24 n.17.)

     As with a claim for intentional infliction of emotional distress, a negligent infliction of

emotional distress claim "must be supported by allegations of conduct by a defendant so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Dawkins v. Williams*, 413 F. Supp. 2d 161, 178 (N.D.N.Y. 2006) (quoting *Dillon v. City of New

York*, 704 N.Y.S.2d 1, 7-8 (1st Dep't 1999)).  A three-year statute of limitations applies to claims

of negligent infliction of emotional distress.  *Id*. at 177.  Thus, in considering whether Plaintiff

has raised a triable issue of fact, the Court must examine Defendant's entire course of conduct,

rather than simply the events occurring after March 25, 2008.

     In New York, a plaintiff must generally show that he or she has been sexually battered

before a court will find that he or she has met the outrageous conduct element of a negligent

infliction of emotional distress claim arising from sexual harassment.

> [W]here New York courts have recognized a claim for . . . infliction
> of emotional distress in the employment context, the claims have
> alleged not merely sexual harassment, but more significantly, battery.
> Such battery . . . is most often sexual in nature, and not merely a
> "garden variety" assault . . . . For example, in *Jaffe v. National
> League for Nursing*, the court held that the plaintiff's allegations,
> which included " 'a hard slap on [plaintiff's] backside,' during an
> outburst of rage," "f[ell] short of the rigorous standard of outrageous
> conduct necessary to maintain a cause of action for intentional

inflection of emotional distress". While an assault clearly took place, nothing in the court's opinion suggests that it was sexually-motivated. Likewise, in *Ponticelli v. Zurich American Insurance Group*, the court held that plaintiff's allegations did not rise to the level of extreme and outrageous conduct where the only incident of touching alleged—being pushed into a filing cabinet—was not a sexual assault.

*Perks v. Town of Huntington,* 96 F. Supp. 2d 222, 231 (E.D.N.Y. 2000) (citations omitted).

Defendant argues that Plaintiff's negligent infliction of emotional distress claim fails under this standard because "this court has already found that Plaintiff's allegations do not plausibly support a claim for sexual assault or assault and battery . . . ." (Dkt. No. 31-1 at 24.) Defendant misstates this Court's holding. The Court previously held that the events that Plaintiff alleged occurred *after* March 25, 2008, "*standing alone*, are insufficient to plausibly suggest that Defendant committed sexual assault, negligence, or assault and battery." (Dkt. No. 19 at 20, emphasis added.) The Court made no such finding about Defendant's alleged actions in 2007 and early 2008. An allegation that a defendant grabbed a plaintiff's buttocks is sufficient to meet the "extreme and outrageous conduct" standard under New York law. *See Stathatos v. Gala Res., LLC*, No. 06 Civ. 13138 (RLC), 2010 U.S. Dist. LEXIS 50511, at *37, 2010 WL 2024967, at *13 (S.D.N.Y. May 21, 2010).[25] Therefore, I recommend that the Court deny Defendant's motion for summary judgment of Plaintiff's negligent infliction of emotional distress claim.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED IN PART AND DENIED IN PART**. I recommend that the motion be granted as to the following claims, which should be dismissed: (1) Plaintiff's retaliation claim regarding the alleged cell

---

[25]    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

searches; (2) Plaintiff's retaliation claim regarding Defendant's alleged comments and gestures;

(3) Plaintiff's Fourth Amendment claim regarding the alleged cell searches; (4) Plaintiff's equal

protection claim; and (5) Plaintiff's intentional infliction of emotional distress claim.  I

recommend that the motion be denied as to the following claims, which should proceed to trial:

(1) Plaintiff's retaliation claim regarding the alleged sexual touching incidents; (2) Plaintiff's

retaliation claim regarding the February 28, 2008 misbehavior report; (3) Plaintiff's Fourth

Amendment claim regarding the alleged sexual touching incidents; and (4) Plaintiff's negligent

infliction of emotional distress claim; and it is further

      **ORDERED** that the Clerk provide Plaintiff copies of *Snyder v. McGinnis*, No.

03-CV-0902E, 2004 U .S. Dist. LEXIS 17976, 2004 WL 1949472  (W.D.N.Y. Sept. 2, 2004),

*Lebron v. Selsky*, No. 9:05-CV-0172 (GTS/DRH), 2010 U.S. Dist. LEXIS 32004, 2010 WL

1235593 (N.D.N.Y. Mar. 31, 2010); *Davis v. Rhoomes*, No. 07 Civ. 6592, 2010 U.S. Dist.

LEXIS 103579, 2010 WL 3825728 (S.D.N.Y. Sept. 30, 2010); *Miller v. Bailey,* No. 05-CV-

5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); and *Stathatos*

*v. Gala Resources, LLC*, No. 06 Civ. 13138 (RLC), 2010 U.S. Dist. LEXIS 50511, 2010 WL

2024967 (S.D.N.Y. May 21, 2010) in accordance with the Second Circuit's decision in *Lebron v.*

*Sanders*, 557 F.3d 76 (2d Cir. 2009).

      Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: June 15, 2012
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

43